# EXHIBIT 1

| | |
|---|---|
| STATE OF INDIANA | ) IN THE MARION COUNTY CIRCUIT COURT NO. |
| | ) SS: |
| | ) CAUSE NO. |
| COUNTY OF MARION | ) |

**ABRIEL SEARS** and **FAITH TAYLOR**, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**ULTA SALON, COSMETICS & FRAGRANCE, INC.,**

Defendant.

**DEMAND FOR A JURY TRIAL**

## COMPLAINT

Plaintiffs Abriel Sears and Faith Taylor, on behalf of themselves and all others similarly situated, complain of Defendant Ulta Salon, Cosmetics & Fragrance, Inc., ("Ulta") as follows, on information and belief except as to their own experiences and matters of public record:

## INTRODUCTION

1. In 2003, like other states around the same time, to protect Indiana residents from the annoyance and harassment caused by the burgeoning spam email industry, the General Assembly enacted and the Governor signed the Deceptive Commercial Electronic Mail Act (DCEMA), codified at Indiana Code title 24, article 5, chapter 22.

2. Among other things, DCEMA prohibits transmitting commercial email that "contains false or misleading information in the subject line" to email addresses actually or constructively known to be held by Indiana residents. Ind. Code § 24-5-22-7(b)(3), (c)(2).

3. Ulta does just what DCEMA prohibits.

4. Ulta spams Hoosiers, including Plaintiffs, with email subject lines that employ various tactics to create a false sense of urgency in their minds and, ultimately, their wallets.

5. Ulta floods Hoosiers' email inboxes with messages communicating, falsely, that their time to act—that is, purchase Ulta's products—is short.

6. This false urgency wastes Hoosiers' time by enticing them to engage with Ulta's fictitious deadlines. It impedes them from making informed purchasing decisions. And it steers them away from shopping around for better deals.

7. Plaintiffs bring this action to put an end to Ulta's harassment of Indiana residents and to remedy the injuries it has caused.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this action under I.C. § 33-28-1-2(a) and I.C. § 33-29-1-4(1).

9. The Court has jurisdiction over Defendant under T.R. 4.4(A) and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because Defendant markets and sells its products in Indiana.

10. Venue is proper in this Court under T.R. 75(A)(5) because Plaintiff Abriel Sears resides in Marion County.

## PARTIES

11. Plaintiff Abriel Sears is a resident of Marion County, Indiana.

12. Plaintiff Faith Taylor is a resident of Lake County, Indiana.

13. Defendant Ulta Salon, Cosmetics & Fragrance, Inc., is a corporation incorporated in Delaware with its principal place of business at 1000 Remington Blvd., Ste. 120, Bolingbrook, IL 60440.

## FACTUAL ALLEGATIONS

### I. DCEMA protects Indiana residents from deceptive spam emails.

14. All Internet users—which is to say, virtually everyone—bear the cost of deceptive commercial spam.

15. In the more than two decades since DCEMA's enactment, the problem of commercial spam has only grown exponentially.

16. In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

17. In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).

18. Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice" approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

19. Consumers therefore routinely "consent" to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

20. This includes emails sent to consumers from businesses with which they have no prior relationship, thanks to commercial data brokers and commercial data sharing agreements.

21. Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox:

Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

22. DCEMA exists to remedy and deter these harms, akin to those remedied and deterred by nuisance or fraud actions.

23. DCEMA's requirement of truthfulness in commercial email marketing simultaneously protects consumers from nuisance and deception and facilitates honest commerce.

**II. False time scarcity claims are an insidious tool in the commercial spammer's toolkit.**

24. One common way online marketers "manipulate consumer choice by inducing false beliefs" is to create a false sense of urgency or to falsely claim that consumers' time to act is scarce. Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

25. The Federal Trade Commission has identified the "False Limited Time Message" as one example of false time scarcity claims, in which the marketer creates "pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached." *Bringing Dark Patterns to Light*, *supra* para. 23, at 22.

26. "False or misleading scarcity claims can change the behavior of consumers." *Online Choice Architecture*, *supra* para. 23, at 27.

27. Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role*, 12 Frontiers in

Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

28. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 23, at 26.

29. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*

30. Under time pressure, "consumers might take up an offer to minimize the uncertainty of passing it up." *Id.*

31. False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit*.

32. Indeed, one 2019 study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

33. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information." *Id.*

## III. The subject lines of Ulta commercial emails deploy false time scarcity tactics against consumers.

34. Ulta operates a national chain of cosmetics stores and also sells and markets its products online.

35. To promote its products, Ulta floods consumers' inboxes with marketing emails at an approximate average rate of three per day, every day. Since 2021, Ulta has been blasting out marketing emails at a rate averaging (at least) 400 per year, or 30 per month, or 1 per day.

36. False time scarcity claims are a staple of Ulta's email marketing practices. These claims are part of a preplanned, preconceived marketing strategy that Ulta orchestrates in advance to maximize sales by distorting information about the duration and availability of its sales, promotions, and other offers.

One common theme in Ulta's deceptive subject headings is a falsely time-sensitive "$10 off" deal.

For example, on February 17, 2025, Ulta sent an email with the subject line, **"Say bye to $10 off 50 or $20 off $100,"** communicating that consumers would miss out on this offer if they didn't act immediately—as confirmed by the body of the email, which stated "Offer ends Mon, February 17 at 11:59pm CT."

This was misleading. The very next day, February 18, 2025, Ulta issued another email with the subject heading "$10 off for you!" where the body of the email demonstrated that the "$10 off" deal offered on February 17 was, in fact, available through February 22, 2025.

37. In another example, on May 10, 2024, Ulta sent an email with the subject line, **"Your $10 off disappears - TOMORROW,"** communicating that consumers would miss out on this offer if they didn't act immediately—as confirmed by the body of the email, which stated "Offer ends May 11 at 11:59pm CT."

38. But this offer didn't "disappear"; it was regularly available in May 2024. Ulta sent an email a few days later, on May 24, 2024, with the subject heading, "$10 off in store or online?! We're in." And it blasted another email to consumers on May 31, 2024, where the subject line stated: "🤩 Just for you, —! Claim your $10 OFF now 🤩." The content of both of these emails stated, in fine print, "Offer ends June 1 at 11:59pm CT."

Later that same year, Ulta pummeled consumers with an email on Friday, October 18, 2024

that included the urgent subject heading, **"Your $10 off expires Saturday."**

But in that same month, on October 29, it sent another email with the subject line, "$10 OFF just landed in your beauty bag." And that offer was "valid through 11.23.24."

Indeed, Ulta offers the "$10 off" deal continuously throughout a given year.

39. This persistent pattern of offering $10 off its products belies Ulta's repeated and deceptive assertions that the offer will "disappear" or that a consumer must "say bye" to such offers. In fact, the offer regenerates repeatedly from month to month to month.

40. Another deceptive subject line heading in Ulta's marketing emails is the "50% off" deal, as the following examples show.

For example, on March 27, 2025, Ulta blasted an email to consumers that stated in the subject heading: **"LAST DAY! 50% off Beauty Steals 🧡"**.

The same day, Ulta sent a second email that stated: **"LAST CHANCE—50% OFF Beauty Steals."**

But March 27 was not the "last day" or "last chance" for anything. On March 28, Ulta sent another email winkingly announcing a "BONUS DAY" for the "Beauty Steals" promotion.

In another example, on March 23, 2024, Ulta repeated a familiar pattern, sending an email with the subject heading, **"⚠️ LAST CHANCE ⚠️ Get 50% off Beauty Steals!"** But, in fact, the deal was offered through March 28 and then promptly restarted on April 9.

Similarly, on March 8, 2024, Ulta sent an email with the subject line, "ENDS TONIGHT!! 50% off Beauty Steals". Again, however, the deal was offered through March 28 and then promptly restarted on April 9.

41. Ulta is practiced in this trick of luring in consumers through an urgent subject heading that does not reflect the true availability of the deal itself, as these additional examples demonstrate.

On July 21, 2024, Ulta blasted consumers with an email that had the heading, **"LAST DAY to get 10% off."**

Yet, just four days later, on July 25, 2024, it ran a *better deal* that equated to 20% off (*i.e.* $20 off $100 and $10 off $50).

On November 4, 2023, Ulta ran an email campaign with the subject heading, **"ENDS TODAY Up to 40% off makeup"**—a "40% off" deal Ulta ran again on November 11, 2023.

42. The following additional email subject lines follow the patterns described above:

a. November 2, 2024: **"ENDS TONIGHT 😮😍 15% off EVERY in-app purchase!"** and **"FINAL DAY: Stack 15% off + exclusive deals in the app! 📲"**. The promotion was falsely "extended" the following day.

b. October 7, 2024: **"TWO. MORE. DAYS. Get $10 off 💖🛍️"**. An identical promotion was offered two days after this one was announced to be ending, on October 11.

**IV. Ulta knows, actually or constructively, when it sends emails to Indiana residents.**

43. A sophisticated commercial enterprise, like Ulta, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

44. First, the sheer volume of email marketing that Ulta engages in put it on notice that Indiana residents would receive its emails.

45. Second, Ulta may obtain location information tied to email addresses when consumers purchase Ulta products, or otherwise self-report such information to Ulta.

46. Third, Ulta may obtain location information tied to email addresses by tracking the IP addresses and other identifiers of devices used to open Ulta emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/). Among other technologies, Ulta uses Oracle to manage its email marketing campaigns, which, on its own or in combination with other data and analytics tools, gives Ulta detailed insight into the behavior and characteristics of its email audiences.

47. Specifically, Ulta appears to use Salesforce Marketing Cloud ("SFMC") to manage its email marketing campaign. SFMC allows Ulta to collect and track detailed data about the behavior of its email recipients, including open and click-through rates,[1] as well as "geographical data."[2]

48. Fourth, Ulta may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

49. Fifth, Ulta may obtain location information tied to email addresses by using "identity resolution" services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

---

[1] *See* Salesforce, *Tracking in Email Studio*, https://help.salesforce.com/s/articleView?id=mktg.mc_es_tracking_overview.htm&type=5/ (last accessed August 13, 2026).

[2] Salesforce, *What Is Email Tracking?*, https://www.salesforce.com/marketing/email/tracking/?bc=OTH/ (last accessed August 13, 2026).

50. It is highly probable that a seller of Ulta's size and sophistication employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

**V. Ulta has violated Plaintiffs' rights under DCEMA to be free of deceptive commercial spam.**

51. Ulta has spammed Plaintiffs with commercial emails whose subject lines contain false or misleading statements in violation of their rights to be free from such annoyance and harassment under DCEMA.

52. Plaintiff Taylor received, for example, the following emails from Ulta at a personal email address:

a. March 27, 2025: "LAST DAY! 50% off Beauty Steals 🧡"

b. November 2, 2024: "FINAL DAY: Stack 15% off + exclusive deals in the app! 📲"

c. November 4, 2023: "ENDS TODAY Up to 40% off makeup"

53. Plaintiff Sears received, for example, the following emails from Ulta at a personal email address:

a. November 2, 2024: "ENDS TONIGHT 😲😍 15% off EVERY in-app purchase!"

b. November 2, 2024: "FINAL DAY: Stack 15% off + exclusive deals in the app! 📲"

54. The subject lines of these emails are false or misleading, in violation of DCEMA, because they made false or misleading factual representations about the duration or availability of Ulta sales, offers, or other promotions.

55. It is likely that Plaintiffs have received all the marketing emails sent by Ulta since their email addresses were added to Ulta's marketing list, beyond those which they happened to save in their inbox.

**CLASS ALLEGATIONS**

56. Plaintiffs bring this action under T.R. 23, on behalf of themselves and all others similarly situated.

57. Subject to future amendment or revision, Plaintiffs seek to represent the following putative class ("Class"):

> All Indiana residents who, during the Class Period, received a commercial email sent by Defendant or with Defendant's assistance that contained messaging in the email's subject line which misrepresented the facts of a sale, deal, or other promotion.

58. Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiffs; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

59. The Class Period extends from the date six years before this Complaint is filed to the date a class certification order is entered in this action.

60. Plaintiffs reserve the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Indiana residents.

61. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to contain, at minimum, thousands of members.

62. There are questions of law or fact common to the class, including without limitation whether Defendant transmitted or assisted the transmission of commercial emails containing false

or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had reason to know were held by Indiana residents; whether Defendant's conduct violated DCEMA; and whether Defendant should be enjoined from such conduct.

63. Plaintiffs' claims are typical of the Class's because, among other reasons, Plaintiffs and Class members share the same statutory rights under DCEMA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative Class members.

64. Plaintiffs will fairly and adequately protect the Class's interests because, among other reasons, Plaintiffs share the Class's interest in avoiding unlawful false or misleading marketing; have no interest adverse to the Class; and have retained competent counsel extensively experienced in consumer protection and class action litigation.

65. Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiffs and the Class, which violate DCEMA in the same way, and from which it may be enjoined as to Plaintiffs and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

66. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

67. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small

to justify individual litigation and management of this action as a class presents no special difficulties.

## CLAIMS TO RELIEF

### COUNT I
### Violation of the Indiana Deceptive Commercial Electronic Mail Act
### Ind. Code § 24-5-22-7
### On behalf of the Class

68. Plaintiffs incorporate and reallege paragraphs 1–67 above.

69. Defendant has initiated the transmission, within the meaning of Indiana Code § 24-5-22-4, or assisted the transmission, within the meaning of Indiana Code § 24-5-22-1, of commercial electronic mail messages, within the meaning of Indiana Code § 24-5-22-2, that contain false or misleading information in the subject line to electronic email addresses, within the meaning of Indiana Code § 24-5-22-3, that Defendant knows or has reason to know are held by residents of Indiana.

70. Plaintiffs have received commercial electronic mail messages containing false or misleading information in the subject line of which Defendant has initiated the transmission or assisted the transmission.

71. For Defendant's violations of the Deceptive Commercial Electronic Mail Act, Plaintiffs seek an injunction against future violations, as well as actual damages or presumptive damages of $500 for each violation, whichever is greater.

## PRAYER FOR RELIEF

72. Plaintiffs ask the Court to

a. Certify this action as a class action under T.R. 23; appoint Plaintiffs as Class representatives; and appoint Plaintiffs' counsel as Class counsel;

b. Enter a final judgment in Plaintiffs' and the Class's favor that awards actual or presumptive damages to Plaintiffs and the Class, according to proof; permanently enjoins Defendant from the unlawful conduct alleged; and awards pre- and postjudgment interest, as allowed by law;

c. Award Plaintiffs and their counsel their reasonable costs and fees incurred in prosecuting this action, as allowed by law; and

d. Order such further relief as the Court finds appropriate.

**JURY DEMAND**

73. Plaintiffs demand a trial by jury on all issues so triable.

[*Signature page follows.*]

DATE: August 18, 2026

Respectfully submitted,

/s/ *Lynn A. Toops*

Lynn A. Toops, No. 26386-49
Natalie A. Lyons, No. 36583-32
Ian R. Bensberg, No. 33956-53
**CohenMalad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com

Samuel J. Strauss*
Raina C. Borrelli*
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
sam@straussborrelli.com
raina@straussborrelli.com

*Attorneys for Plaintiffs*
* Applications for admission *pro hac vice* forthcoming